**INDASU INTERNATIONAL, C.A., Plaintiff–Appellee,**

v.

**CITIBANK, N.A., Defendant–Appellant.**

**No. 1342, Docket 88–7249.**

United States Court of Appeals, Second Circuit.

Argued Aug. 19, 1988.
Decided Nov. 17, 1988.

Donald J. Kennedy, New York City (John M. Toriello, Alan Heblack, Haight, Gardner, Poor & Havens, New York City, of counsel), for plaintiff-appellee.

Charles A. Crocco, Jr., New York City (Andrew P. Saulitis, Lawrence B. Brennan, Lunney & Crocco, New York City, of counsel), for defendant-appellant.

Before WINTER and MINER, Circuit Judges, and BILLINGS, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellee Indasu International, C.A. ("Indasu") commenced this diversity action in the United States District Court for the Southern District of New York (Broderick, J.) against Citibank, N.A. ("Citibank") claiming the face amount of a Carta de Garantia ("Guarantee"). The Guarantee was issued by Citibank as guarantor in favor of Indasu to ensure that Corporacion Estatal Petrolera Ecuatoriano ("CEPE") would enter into and perform a contract. Citibank twice moved unsuccessfully to dismiss the action on grounds of *forum non conveniens*, contending that Ecuador would be the proper forum. Judge Broderick heard the case without a jury, after which he directed entry of judgment in favor of Indasu for the face amount of the Guarantee, $1,500,000.00, plus interest.

Citibank appeals from the judgment, asserting that it was prejudiced substantially by the district court's denial of its motion for dismissal based on *forum non conveniens*. Citibank also argues that the district court misapplied Ecuadorian law when it read into the Guarantee the "course of conduct" and "intent" of the parties to the guaranteed contract, thus varying the purported preconditions of that instrument without Citibank's consent. Finally, Citibank contends that the district court erred in finding that the preconditions had not been violated.

We affirm the district court's denial of the motion to dismiss on grounds of *forum non conveniens*. We reverse, however, the judgment of liability arising from the Guarantee because, under Ecuadorian law, a guarantee containing written conditions cannot be modified or waived without the consent of the guarantor.

## BACKGROUND

Indasu is a Panamanian corporation with its principal place of business in Miami, Florida. Indasu is affiliated with a Venezuelan corporation, Hideca Oil International ("Hideca"). On July 24, 1980, Hideca entered into an agreement with the state oil company of Ecuador, CEPE, in connection with a government project to exploit gas deposits in the Guayaquil Bay, off the coast of Ecuador. In this "Guayaquil Agreement"[1] Hideca agreed to transfer to CEPE its rights to one or more of three specific oil drilling platforms. According to the Agreement, Hideca held options to rent the platforms for three years at fixed rentals on a "bare boat" (i.e., without crew) basis. Within ten days of the date of the Agreement, CEPE was to "nominate" which of the platforms it wished to rent. CEPE promised to sign a lease for the platform within forty-five days of the date of the Agreement, and to provide a performance guarantee (the Guarantee that is the subject of this action) in the amount of $1,500,000 against its obligation to sign the lease. The Agreement also required the

---

* Hon. Franklin S. Billings, Jr., U.S. District Judge, District of Vermont, sitting by designation.

1. All of the operative documents in this case are in Spanish. Throughout this opinion quotes are taken from the Spanish original or English translation.

parties to create an "Open Capital Company" that would operate the platform. CEPE then was to enter into a contract with the new company, obligating CEPE to furnish personnel, insurance and maintenance for the platforms.

The deadline for nominating the specific platform to be provided under the Guayaquil Agreement passed without any nomination by CEPE and without objection by Hideca. Thereafter, in a "Nomination Agreement" dated August 7, 1980, CEPE nominated the "Goldman L–780 platform," listed in clause 1(b) of the Guayaquil Agreement as "under construction in Europe, availability December 1980." The specific platform nominated was known as the "Salen V." The Nomination Agreement contained certain "terms and conditions": (1) Hideca was to deliver the complete technical specifications for the nominated platform within thirty days; (2) CEPE was to conduct a final inspection of the platform at the European shipyard prior to delivery; (3) Hideca was to negotiate a delivery-date guarantee, to be issued by a "first class international bank," against a December 1980 delivery of the platform; and (4) CEPE would comply with its obligation under the Guayaquil Agreement to provide a performance guarantee.

A public scandal erupted after the Nomination Agreement was signed, making it politically undesirable for CEPE to deal with Hideca. Hideca suggested as a substitute its platform broker, Indasu, so that CEPE could honor the agreements without dealing directly with Hideca. On August 27, 1980, a representative for Hideca, Dr. Sardi, telexed CEPE that Indasu would assume Hideca's obligations to CEPE. The specific obligations undertaken by Indasu, which tracked Hideca's obligations to CEPE, were set forth in the telex. CEPE apparently consented to Indasu's assumption of these commitments. The telex also provided that CEPE would issue the performance bond guarantee "in favor of Indasu," to "be in effect until the signing of the definitive lease contract."

On August 28, 1980, an official of CEPE visited Citibank's Quito, Ecuador office and discussed the proposed performance guarantee with two Citibank officials. There, the CEPE official obtained the application form for the letter of guarantee and was told to provide instructions regarding specific terms to be included in the guarantee. The application form, dated August 28, 1980, requests that the bank issue a performance bond in favor of Indasu to guarantee "that CEPE will sign a lease contract for a Goldman L–780 jack-up self-elevating platform in accordance with the conditions contained in [a specified] Official Letter." The official letter, dated August 29, 1980, requests the issuance of the bank guarantee and specifies the "condiciones," or terms, including: (1) a daily rental price for the platform of $43,000; (2) delivery by Indasu of a counter-guarantee in favor of CEPE for any delays in delivering the platform after December 31, 1980 and for the same amount as the CEPE guarantee; (3) the right of CEPE to inspect the platform prior to signing the lease; and (4) compliance with all provisions of the agreements between Hideca and CEPE. The official letter also requests that the guarantee automatically terminate upon the non-compliance with any one of the specified "condiciones."

The "Guarantee" [2] issued by Citibank on September 2, 1980 is an "unconditional and

---

2. The text of the Guarantee follows:
   Re: Letter of Guarantee GBD–1281 in the amount of US $1,500,000.00 (One million five hundred thousand 00/100 dollars) for the account of CEPE
   Gentlemen:
   By this instrument we, Citibank N.A., branch office in Quito, Ecuador, do constitute ourselves towards you as unconditional and irrevocable Joint and Several Guarantor of Corporacion Estatal Petrolera Ecuatoriana (CEPE) (Ecuador State Petroleum Corporation) for the purpose of guaranteeing a three-year Lease Contract be-

tween INDASU INTERNATIONAL INC., of Miami, U.S.A., and Corporacion Estatal Petrolera Ecuatoriana (CEPE), in the amount of ONE MILLION FIVE HUNDRED THOUSAND UNITED STATES DOLLARS (US $1,500,000.00), covering a self-lifting drilling platform, "Jack–Up" type, make Goldman L–780, subject to the following conditions:
1. The rental price of said platform shall be $43,000.00 per day.
2. INDASU INTERNATIONAL INC., the broker, or the owner of the platform, shall in

irrevocable" guarantee of CEPE's performance in favor of Indasu, subject to the four specific "condiciones" listed in CEPE's August 29 request. Included also is an automatic termination clause providing that "in the event of failure to comply with any of the [condiciones] ... the guarantee issued by this document shall automatically cease to be in effect." It further provides that CEPE would sign the lease within forty-five days (by October 17th) and that the Guarantee would expire December 31, 1980.

On September 23rd, CEPE telexed Indasu that it had failed to issue a counter-guarantee as required by the August 27 telex. CEPE threatened to cancel the Citibank Guarantee unless Indasu provided a counter-guarantee within twenty-four hours. Indasu responded on September 24th, claiming that the events triggering Indasu's obligation to provide a counter-guarantee had not yet transpired and that the terms of the counter-guarantee had never been agreed to.

On October 3, 1980, CEPE instructed Citibank to declare the Guarantee void due to Indasu's failure to comply with the agreed terms. On October 8th, nine days before the scheduled deadline for signing the platform lease, Citibank telexed Indasu, cancelling the Guarantee. At that time, Indasu had an offer from Salen, the platform manufacturer in Europe, to lease at least three platforms of the type specified in the Guayaquil Agreement, but with full crew (not "bare boat") and not the Salen V. As of October 8th, the date that the Guarantee was cancelled, the Salen V was unavailable for lease in December 1980.

Indasu did not immediately protest the cancellation of the Guarantee. It continued, unsuccessfully, its attempts to induce CEPE into signing a lease. On December 30, 1980, Indasu telexed Citibank protesting the revocation of the "unconditional and irrevocable" Guarantee without specifying Indasu's defaults and without offering an opportunity to remedy the defaults. On January 2, 1981, Citibank responded, specifying three conditions that Indasu had not fulfilled: (1) Indasu had not provided a counter-guarantee; (2) Indasu had never offered CEPE the opportunity to inspect the platform to be leased; and (3) CEPE never signed a contract with Indasu within the forty-five days required by the Guarantee. Indasu again demanded payment under the Guarantee on January 13th; Citibank refused the following day. Indasu commenced this action in the District Court

turn deliver the Guarantee in the amount of US $1,500,000.00 in favor of CEPE, in which a daily penalty of US $40,000.00 shall be stipulated for the delay in the delivery of the platform, a performance guarantee which shall be irrevocable, unconditional and for immediate collection, issued by a first-class International Bank, after approval by CEPE.

3. Prior to signing of the Lease Contract, CEPE shall have the right to inspect the platform to verify that it is in optimal operating condition and that it meets the required and offered technical specifications, whereupon it shall issue its acceptance.

4. The compliance with what has been stipulated in the agreement signed in the City of Guayaquil on July 24, 1980, between the General Manager of CEPE and the Representative of HIDECA OIL INTERNATIONAL INC., Dr. Alvaro Sardi, and the nomination agreement signed on August 7, 1980, as well as the telex dated August 8 of this year, sent by HIDECA OIL INTERNATIONAL INC. with respect to the leasing of the platform, shall form part of this Guarantee for all legal purposes thereof. In the event of failure to comply with any of the requirements set forth in the preceding numbered paragraphs, the guarantee issued by this document shall automatically cease to be in effect.

The lease contract which CEPE shall sign with INDASU INTERNATIONAL INC. within 45 days from the date of this bank guarantee, may be transferred to a third party if the beneficiary should so order, provided that the purposes and conditions thereof be complied with by the third party.

In the event that the party guaranteed by us fails to perform the provisions of this guarantee, the beneficiary INDASU INTERNATIONAL INC. or the third party indicated by it may, for rendering this guarantee effective, regard it as sufficient for this purpose by submitting a written communication from the General Manager proving the nonperformance on the part of CEPE, after learning thereof.

This guarantee shall expire on December 31, 1980, the latter date included, and shall be considered automatically void even if the original of this guarantee is not returned to us.

for the Southern District of New York, the district in which Citibank has its principal place of business.

*The District Court Proceedings*

The district court first noted what it considered to be the anomolous nature of the "unconditional" Guarantee containing several "condiciones." Indasu urged the court to interpret the word "condiciones" to mean explanatory "terms" that the parties intended to include in the proposed lease contract. Thus, Citibank would be guaranteeing that CEPE would sign a lease containing the four enumerated paragraphs. Citibank, in contrast, interpreted the word to mean "prerequisites," with which anything other than strict compliance would render the Guarantee unenforceable.

The district court found it unnecessary to resolve this issue as to the first three "condiciones" because, assuming *arguendo* that the Guarantee had prerequisite conditions, Indasu stood ready to fulfill those conditions as of the date Citibank sent its cancellation telex, October 8, 1980. The court determined that, as of that date, the fulfillment of the first three "condiciones" was not yet required. The court reasoned that the parties understood those "condiciones" to be due on or after the signing of the lease, an event that had not yet occurred. As to the fourth "condicione"—compliance with the various agreements between Indasu, Hideca and CEPE—the district court determined that because this "condicione" originally was drafted by Indasu, it would be construed in favor of Citibank, and thus would be viewed as a prerequisite condition.

The district court nonetheless concluded that strict compliance with these incorporated agreements was unnecessary because they were "flexible agreements." It reached that conclusion based on the conduct of CEPE, Hideca and Indasu throughout their relationship, including the period following Citibank's issuance of the Guarantee. For instance, although the July 24, 1980 "Guayaquil Agreement" provided that Hideca held options on three specifically described oil platforms, the court found that Carvajal, CEPE's general manager,

understood that to mean that Hideca was in a position to make a "hard bid" on each of these platforms. The district court also stressed Citibank's failure to "rely upon any terms contained in the documents in issuing the [Guarantee]." Further, in cancelling the obligation, Citibank merely relied on CEPE's blanket request, without learning of any deviations that could serve as a basis for revoking the Guarantee.

Having found that Indasu had not breached any condition of the Guarantee as of October 8, 1980, the district court concluded that Citibank improperly cancelled the Guarantee. The court concluded that, while Indasu did not challenge the cancellation of the Guarantee until December and Indasu never tendered performance of its obligations to CEPE, Indasu was under no obligation to do so: "Once the irrevocable guarantee was revoked, its provisions no longer applied, and whether Indasu did or did not present a lease to CEPE became immaterial," slip op. at 27. Moreover, the court found that Citibank could not raise Indasu's non-performance as a defense because CEPE itself was not ready to perform, and once the Guarantee was revoked, Indasu could not perform. The court reasoned that, without the Guarantee, Indasu could not attract a lessor to the deal because there was no assurance that CEPE would perform.

■ On appeal, Citibank presses the same arguments it made to the district court. In light of the Ecuadorian rule that guarantee contracts must be written, we hold that the district court erred in adopting the unstated intent and course of conduct of the non-guarantor parties as part and parcel of the agreements incorporated into the Guarantee.

## DISCUSSION

Although the district court's findings of fact are governed by the clearly erroneous standard, *see* Fed.R.Civ.P. 52(a); *Bailey v. Grand Trunk Lines New England,* 805 F.2d 1097, 1102 (2d Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 94, 98 L.Ed.2d 54 (1987), determinations of foreign law are conclusions of law, *see* Fed.R.Civ.P. 44.1;

*Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970), and thus subject to *de novo* review, *see Kalmich v. Bruno*, 553 F.2d 549, 552 (7th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

■ Ecuador is a civil law jurisdiction. The Ecuadorian Commercial Code ("E.Com. C.") governs transactions of this type, and to the extent that the Commercial Code does not address the specific matter, the Ecuadorian Civil Code ("E.Civ.C.") applies. *See* E.Com.C. art. 5. For our purposes, the law of Ecuador has only three rules regulating guarantees (or "fianzas"): they must be in writing, *see* E.Com.C. art. 603; they may issue for a limited time period; and they may be subject to conditions, E.Civ.C. art. 2267. Otherwise, Ecuadorian contract rules apply.

Indasu urges this Court to look to the general contract rules, specifically articles 1603 and 1607 of the Civil Code. Article 1603 instructs that the intent of the parties controls over the literal meaning of the words. Article 1607 provides that the clauses of a contract will be interpreted by the practical application given to those clauses by the parties and by other contracts between the same parties concerning the same subject matter (i.e., course of conduct). These provisions bolster the argument that the agreements incorporated into the Guarantee are "flexible agreements," their stated terms modified by the intent of the original contracting parties and by their subsequent course of conduct. This argument fails.

Unlike a general contract, which may be oral, *cf.* E.Com.Code art. 141 (oral offer of business may be valid if accepted immediately), a "fianza," or guarantee, must be in writing, *see id.* art. 603. The clear import of this rule is that the *terms* of the Guarantee must be in writing.

The critical term is contained in the fourth clause of the Guarantee, which requires "compliance with what has been stipulated in the agreement signed in … Guayaquil … and the nomination agreement … as well as the telex dated August 8[, 1980]." This clause unambiguously refers to the obligations of CEPE and Hideca *as memorialized* in those agreements. In the Guayaquil Agreement Hideca represented that it held options on three oil platforms, but in reality there were no such options. Hence, the terms under which Indasu here brings suit are not those that Citibank guaranteed. Moreover, the district court correctly construed this clause as a precondition, which under Ecuadorian law must be performed literally, E.Civ.C. art. 1527, and totally, *id.* art. 1528. Because Indasu has not so performed, it cannot recover.

Indasu claims the benefits of article 11 of the Civil Code, which provides that rights conferred by law may be waived, so long as they deal solely with the individual interest of the waiving party. But even if article 11 allows CEPE to waive its rights in regard to the platform options, the waiver could not affect the right of Citibank to insist on strict performance of its Guarantee. Although Indasu argues that CEPE itself was not ready to perform and allowed other deadlines to pass, it would have been foolhardy for CEPE to acquire personnel, insurance and maintenance for an unavailable platform. The fact that Citibank gave nonspecific reasons for its cancellation of the Guarantee is of no import because Citibank was entitled to cancel the Guarantee at any time.

■ Because Citibank is successful on the merits, we need not dwell on the issue of *forum non conveniens*. After a full trial, a party challenging a determination of *forum non conveniens* must display substantial prejudice. *See In re Air Crash Disaster*, 821 F.2d 1147, 1168 (5th Cir. 1987). A successful party, such as Citibank, obviously cannot claim such prejudice.

## CONCLUSION

The judgment of the district court is reversed.