**WALPEX TRADING CO., Plaintiff,**

**v.**

**YACIMIENTOS PETROLIFEROS FISCALES BOLIVIANOS, Defendant.**

**No. 84 Civ. 4364 (PKL).**

United States District Court, S.D. New York.

April 21, 1992.

Lane & Mittendorf, New York City (Edward C. Cerny, III, of counsel), for plaintiff.

Gibson, Dunn & Crutcher, New York City (Mitchell A. Karlan, Dvora Wolff Rabino, G. Wade Leak, Roger C. Goodspeed, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge.

This is a breach of contract action brought by Walpex Trading Company ("Walpex"), a New York corporation engaged in international exports, against Yacimientos Petroliferos Fiscales Bolivianos ("YPFB"), an instrumentality of the Bolivian government which purchases supplies for that country's national oil program, with jurisdiction founded on section 1605(a)(2) of the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. § 1605(a)(2), and 28 U.S.C. § 1330(a). Currently before the Court are the parties' cross-motions for summary judgment, argued under controlling principles of Bolivian law. For the following reasons, plaintiff's motion for summary judgment on the breach of contract theory of the case is denied, and defendant's cross-motion for

summary judgment on this theory of the case is granted. The cross-motions for summary judgment on the bad faith/equitable estoppel theory of the case are denied.

## I. BACKGROUND

### A. *Procedural History*

As this Court has previously observed, this action, which has been pending for the better part of a decade, has "consumed more legal, financial and judicial resources in the litigation of essentially threshold issues than scores of cases that have been filed, resolved and forgotten in this Court during the same time period." *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 385 (S.D.N.Y.1989) ("*Walpex II*"). For example, earlier Opinions and Orders have denied plaintiff's motion for a default judgment, *see Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 109 F.R.D. 692 (S.D.N.Y.1986) ("*Walpex I*"); denied defendant's motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction and *forum non conveniens, see Walpex II;* and denied defendant's summary judgment motion, which argued that this action could only be maintained in Bolivia, *see Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 756 F.Supp. 136 (S.D.N.Y.1991) ("*Walpex III*").[1]

Nevertheless, although these threshold motions have all been denied, progress clearly has been made in this action to date. Thus, for example, thorny issues relating to the scope of jurisdiction under the FSIA have been resolved in favor of the exercise of jurisdiction over YPFB. *See Walpex II,* 712 F.Supp. at 388–92. In addition, *Walpex III* held that Bolivian substantive law governs this action. *See* 756 F.Supp. at 139–42. At the same time, however, it is clear that much of the work in this case is still before the parties. For example, defendant claims that "Walpex has thus far refused to comply with YPFB's document requests and has refused to make its witnesses available for depositions." *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment ("Defendant's Response"), at 10. In fact, by Order dated July 29, 1991, Magistrate Judge Roberts noted that "[d]efendant reserves the right to conduct discovery if the court determines that plaintiff may proceed in this court and has stated a cause of action under Bolivian law."

### B. *Factual Background*

With this procedural background in mind, the Court turns to the factual underpinnings of this dispute, which are essentially undisputed. In February 1982, defendant publicly invited bids for the supply of 88,500 feet of three and one-half inch seamless steel tubing and accessories to be used by the Bolivian oil industry. The invitation appeared in Spanish in various Bolivian newspapers. As translated into English, it provided as follows:

INVITATION

PUBLIC BID NO. 120–81

SUPPLY OF: PRODUCTION PIPING

Interested firms hereby are invited to present bids for the supply of:

PRODUCTION PIPING

The List of Specifications may be obtained from the Technical Consulting office of the Materials Department, located at the YPFB building, 4th Floor, 185 Bueno Street.

Bids with the formal requirements set forth in the List of Specifications will be

1. The decision in *Walpex III,* which rejected YPFB's claim that this suit can only be maintained in Bolivia, is the law of the case. *See Liona Corp. v. PCH Associates (In re PCH Associates),* 949 F.2d 585, 592 (2d Cir.1991). Moreover, the Court has already denied YPFB's motion for reargument of the decision in *Walpex III. See* Memorandum Order, dated May 6, 1991, 1991 WL 79464. The Court therefore rejects, without further discussion, all arguments in the instant motion concerning the purported exclusivity of the Bolivian forum.

received in the Technical Consulting office until 5:00 p.m., March 2, 1982.

*Walpex II,* 712 F.Supp. at 387 n. 2.

The Specifications referred to in the Invitation provided in pertinent part:

> Paragraph 1.0:
>
> The bidding is ruled by the Regulations for Acquisitions and Contracts of YPFB, approved by Decree Law 16857 of July 20, 1979 ("Regulations") and by related norms in force in the Country.
>
> Paragraph 2.3.3:
>
> The presentation of a bid implies the bidder's submission to the legal system cited in paragraph 1.0 and to all laws in force in the country, as well as to all requirements in this list of Specifications.

*Walpex III,* 756 F.Supp. at 138.

Walpex received YPFB's invitation for bids and the requisite Specifications through its Bolivian agent, Compania de Representaciones Internacionales, S.R.L. ("COREIN"). Plaintiff's Memorandum of Law in Support of its Amended Motion for Summary Judgment ("Plaintiff's Motion"), at 4. In March 1982, Walpex submitted its bid for the supply contract through COREIN, and on April 7, 1982, YPFB advised COREIN, in writing, that Walpex had been awarded the contract and that COREIN should come to YPFB's offices in La Paz to sign the formal contract. However, the formal written contract was never executed. *See* Walpex Amended Statement Pursuant to Rule 3(g) ("Walpex R. 3(g) Statement") ¶¶ 4–5; YPFB Statement Pursuant to Rule 3(g) ¶¶ 6–7; Walpex Rule 3(g) Statement in Reply to Defendant's Rule 3(g) Statement ¶ 3.

Thereafter, Walpex took various steps in preparation for performance under the contract, including procuring an irrevocable letter of credit in favor of YPFB; obtaining the documents necessary for COREIN to execute the contract on its behalf; and entering into a contract with an American supplier, Vinson International ("Vinson"), for supply of the pipe. *See* Plaintiff's Motion, at 8. However, during the next fifteen months, Bolivia's economy was severely disrupted, as a result of the Falklands war between Argentina and Great Britain. Ultimately, on July 28, 1983, after numerous extensions of the time for execution and performance, YPFB repudiated the contract, stating that it was unable to obtain financing for the project from the World Bank.

While the general contours of the action, as outlined above, are clear, the parties have presented other disputed factual averments to the Court, supported by documentary evidence, in an effort to explain the disputed transaction. For example, Walpex claims that there is a wealth of documentary evidence demonstrating that YPFB publicly manifested the fact that it had entered into a binding contract with Walpex, by ceasing negotiations with other suppliers, preparing a purchase order incorporating the terms of the Walpex bid, seeking extensions of time within which to perform and requesting renewals of the letter of credit. *See id.* at 11–16. Moreover, Walpex asserts that documents produced during discovery indicate that YPFB "decided to suspend the purchase shortly after the ... award was made," Plaintiff's Motion, at 11, but that this decision was not communicated to Walpex.

Based on these allegations, and supported by documentary evidence, plaintiff argues that it formed a contract with the defendant when YPFB awarded the bid to Walpex. Moreover, Walpex claims that it took steps in reasonable reliance on the existence of this contract, and that it was injured by the repudiation of the contract and by defendant's bad faith failure timely to inform plaintiff that it would not perform. In contrast, defendant asserts that, under controlling principles of Bolivian law, no contract was ever formed between Walpex and YPFB, and that any reliance by Walpex on the putative pipe-supply contract was not reasonable. For example, YPFB asserts that Bolivian law imposes mandatory formalities on execution of a contract with an instrumentality of the Bolivian government, and that these formalities never were complied with. Moreover, defendant claims that Walpex acted at its own risk by entering a supply contract with Vinson before execution of a formal con-

tract with YPFB. In support of this argument, YPFB quotes from a letter from YPFB to COREIN, dated April 4, 1983, stating that:

> We wish to inform you that [Walpex] signed contracts with an American tube sales company ... solely upon the notification of award from YPFB to your company. This office highly values the degree of responsibility and willingness to serve YPFB displayed [by Walpex]. However, YPFB cannot be responsible for any steps taken by Walpex before the contract is executed or the necessary purchase order has been issued.

Affidavit of Sergio Palacios De Vizzio, Esq., sworn to on September 20, 1991 ("Palacios Affidavit") ¶ 108, at 68–69. YPFB also asserts that full discovery will shed further light on the intentions of the parties and the reasonableness of Walpex's reliance.

## II. DISCUSSION

### A. *Standard for Summary Judgment*

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is appropriate if, 'after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property, etc.*, 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Herbert Construction Co. v. Continental Insurance Co.*, 931 F.2d 989, 993 (2d Cir.1991).

On a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Anderson, supra,* 477 U.S. at 249, 106 S.Ct. at 2511; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). In determining whether there exist disputed issues of material fact, "[t]he court must resolve any ambiguities and draw all inferences against the moving party. Even though both parties ... agree that there are no issues of fact, the court may still find that factual issues exist." *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554; *accord Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991). Once a motion for summary judgment is properly made, the burden shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & Hudson Railway Co. v. Consolidated Rail Co.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra,* 477 U.S. at 252, 106 S.Ct. at 25, and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)), *cert. denied*, — U.S. —, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

B. *Governing Legal Standards*

As the Court held in *Walpex III,* the instant case is governed by Bolivian law. Before turning to examine Bolivian legal principles, however, the Court first provides an overview of the legal theories that would apply to this case under analogous state law principles. Under New York law, plaintiff's first legal theory would be breach of contract, based on allegations that a contract was formed between the parties and that plaintiff partially performed, but that YPFB failed to perform, causing injury to Walpex. *See, e.g., Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1227 (S.D.N.Y.1991) (suit for breach of contract requires formation of contract, breach and damages). In the case at bar, scrutiny of this theory would focus on the formation of the contract, examining the intentions of the parties, integration of all material contract terms and compliance with formalities. *See, e.g., Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72–73 (2d Cir.1989) (applying " 'strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents' ") (quoting *Teachers Insurance and Annuity Association v. Tribune Co.,* 670 F.Supp. 491, 499 (S.D.N.Y. 1987)); *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs.").

Alternatively, under New York law, plaintiff would argue that YPFB breached its duty of good faith and should be equitably estopped from denying its obligation to Walpex. *See Fasolino Foods Co. v. Banca Nazionale Del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith"); *U.S. West Financial Services, Inc. v. Tollman,* 1992 WL 58863, 1992 U.S.Dist. LEXIS 3169, slip op. at 21 (S.D.N.Y. Mar. 17, 1992) (Mukasey, J.) ("The elements of promissory estoppel as a quasi-contract claim, are: (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) injury sustained by the party asserting the estoppel by reason of his reliance."); *accord Arcadian Phosphates, supra,* 884 F.2d at 73; *Bradkin v. Leverton,* 26 N.Y.2d 192, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643 (1970) ("The contract is mere fiction.... The law creates it, regardless of the intention of the parties, to assure a just and equitable result.").

1. *Applicable Bolivian Law*

The Court next turns to consider applicable principles of Bolivian law. Fed. R.Civ.P. 44.1 provides that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." *See Indasu International, C.A. v. Citibank, N.A.,* 861 F.2d 375, 379 (2d Cir. 1988) ("determinations of foreign law are conclusions of law"); *Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc.,* 770 F.Supp. 139, 144 (S.D.N.Y.1991) (Leisure, J.) (analyzing Finnish law). Both parties have submitted affidavits addressing the principles of Bolivian law that govern this dispute. *See* Palacios Affidavit; Reply Affidavit of Sergio Palacios de Vizzio, Esq., sworn to on December 19, 1991 ("Palacios Reply Affidavit"); Affidavit of Alejandro M. Garro, Esq., sworn to on July 11, 1991 ("Garro Affidavit"); Reply Affidavit of Alejandro M. Garro, Esq., sworn to on November 6, 1991 ("Garro Reply Affidavit").[2]

Under Bolivian law as explained by Professor Garro, the contract between Walpex and YPFB was an administrative contract, subject to award pursuant to a public bidding process, approval by a competent agency and certain formalities, including a notarized writing. *See* Garro Affidavit

2. Translations of Bolivian statutory provisions in the following discussion are drawn from the Garro and Palacios Affidavits.

¶¶ 31–37. The first requirement for formation of such a contract is the award, which is a "[r]esolution whereby the Procurement Board awards the bid to a ... legal entity for the supply of goods." *Id.* ¶ 33(1) (quoting Regulations, Art. 9.1; *cf.* Bolivian Procurement Law for the Public Sector, approved by Decree Law 15223 of December 30, 1977 ("Procurement Law") Art. 22.1). The second requirement is approval, which is a "[l]egal act whereby the competent authority approves the award through the pertinent norm." *Id.* ¶ 33(2) (quoting Regulations, Art. 9.6; cf. Procurement Law, Art. 22.5). Third, the parties must formally execute the contract, which is an "Agreement subscribed by YPFB and the firm or enterprise to thom [sic] the bid was awarded for the supply of goods ..." *Id.* ¶ 33(3) (quoting Regulations, Art. 9.7; *cf.* Procurement Law, Art. 22.6). The final step, which involves formal execution of "a written contract, embodied in a notarial act," must be preceded by further steps, including the posting of a performance bond. *Id.* ¶ 35.

The Palacios Affidavit describes contracts involving instrumentalities of the Bolivian government as "solemn contracts," and expounds further on the formalities required to form such contracts. *See* Palacios Affidavit ¶ 41. According to Palacios, the formal written contract "must be transcribed from the 'minuta' [3] drafted and signed by the parties into the official record of the public deeds kept by the notary in his/her office; the parties must then execute the transcribed document in the public records in the presence of the notary and two witnesses, who also sign." *Id.* ¶ 42. In addition, a contract involving YPFB must be notarized by the Bolivian Notary of Mines and Petroleum. *Id.* Solemn contracts involving Bolivian government agencies also must include choice of law and forum clauses:

> With respect to contracts with foreign organizations, an express clause shall be included to the effect that all issues emerging from the contract shall be subject to Bolivian law and submitted to the jurisdiction of the courts in Bolivia.

Regulations, Art. 120; Procurement Law, Art. 74.

According to the Palacios Affidavit, after the award and approval stages, the governmental agency is not required to execute the formal contract; rather, according to Palacios, "the entity that solicited the bid *may* execute the relevant contract." *See* Palacios Affidavit at 25 n. 5 (quoting Procurement Law Art. 68; *accord* Regulations Art. 114) (emphasis added by Palacios Affidavit). In contrast, Professor Garro asserts that, after award and approval, the agency is "bound to prepare a draft contract in notarial form." Garro Affidavit ¶ 36. However, this assertion is tempered by Professor Garro's concession that the procurement contract can be avoided for reasons of "public necessity," with the aggrieved party entitled to recover substitutionary damages. *See Id.* ¶ 52; Garro Reply Affidavit ¶ 9.

Although the Garro Affidavit claims that, in the absence of execution of contractual formalities, notification of the award and approval of the bid is sufficient to form a contract, this legal argument is supported only by secondary sources. *See* Garro Affidavit ¶¶ 38–48. In contrast, the Palacios Affidavit cites to Article 549 of the Bolivian Civil Code, approved by Decree Law 12760 of August 6, 1975 ("Civil Code"), which provides that "[t]he contract is void ... [w]hen the contract lacks a proper purpose or does not comply with the form contemplated by law for its validity." Palacios Affidavit ¶ 57. Thus, the Court finds that formation of a contract and maintenance of a breach of contract action under Bolivian law requires compliance with the notarial formalities set forth above.

Under Bolivian law, the absence of a notarized contract does not end the inquiry. Rather, the Court must then consider concepts of good faith, bad faith and contributory negligence. Under Article 520 of the Civil Code, "[t]he contract must be exe-

3. In Bolivia, notarization requires drafting, executing and signing "minuta," which are instructions to the notary that include the text of the contract. Palacios Affidavit ¶ 39.

cuted in good faith and binds the parties not only to what is expressly stated in it, but also to all other effects derived from its nature according to law or, in the absence thereof, according to usages and equity." Garro Affidavit ¶ 27. Moreover, Article 803 of the Commercial Code of Bolivia, approved by Decree Law 14379 of February 25, 1977 ("Commercial Code") provides that "[g]ood faith is presumed in all contracts and, consequently, the parties are bound not only to what is expressly stated in them, but also to what pertains to their nature according to law, customs or equity." *Id.*

According to the Palacios Affidavit, the aforementioned provisions only impose a post-contractual duty of good faith, and do not control in the absence of a formal contract. *See* Palacios Affidavit ¶¶ 114–117. However, Palacios also cites Article 465 of the Civil Code, which applies to precontractual conduct:

> In the preliminary stages of negotiation and in the formation of the contract the parties shall conduct themselves in good faith and shall compensate for harm caused [the other party] by negligence, imprudence or omission in giving notice of the causes that may void the contract.

Palacios Affidavit ¶ 118. The absence of good faith is described by use of the term "dolo," which is defined as "any kind of trick, design or artifice used to deceive another [and as] malicious intent to improperly seek a personal benefit or the injury of another by means of any act or contract and by resorting to tricks, artifice or the ignorance of others." *Id.* ¶ 123 (quoting G. Cabanellas, *Diccionario de Derecho Usual* (ed. Heliasta S.R.L., Buenos Aires 1976)). Finally, principles of contributory negligence and assumption of the risk also can serve to reduce or eliminate a party's right of recovery. Under Article 348 of the Civil Code,

> If a wrongful act of the plaintiff has concurred in causing the damage, the damages will be diminished in proportion to the gravity of the act and importance of the consequences arising therefrom.... There is no recovery for those damages that the plaintiff could have avoided by using ordinary diligence.

Palacios Affidavit ¶ 127.

*2. Impact of FSIA*

The Court next turns to consider plaintiff's contention that Bolivian law governing contract formation with respect to governmental agencies should be ignored, and that this dispute should be resolved based on the fiction that YPFB is a private citizen. On its face, the plain language of the FSIA section 1606, which imposes liability on a foreign state "in the same manner and to the same extent as a private individual under like circumstances," can be said to support this result. However, careful examination of the language, structure and history of the FSIA demonstrates that Bolivian contract law with respect to governmental agencies must be applied in this action.

The Second Circuit has observed that the FSIA is a "vaguely-worded statute.... [that was drafted succinctly] at the price of considerable confusion in the district courts." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 302 & 307 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). However, in a series of cases spanning the last decade, the contours of the Act have been defined with greater clarity. Thus, for example, the Supreme Court has held that vesting the federal courts with subject matter jurisdiction to hear suits between foreign plaintiffs and foreign sovereigns is consistent with Article III of the Constitution. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 491–97, 103 S.Ct. 1962, 1970–73, 76 L.Ed.2d 81 (1983). In addition, the Court has held that the FSIA is the sole basis for jurisdiction over a foreign sovereign, and that the Act does not extend to cases alleging tortious activities by armed forces on the high seas. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

Recent cases from the Second Circuit have assisted in categorizing the types of actions that have a direct effect in the

United States that is sufficient to create federal court jurisdiction under FSIA section 1605. *Compare Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 94–96 (2d Cir.1991) (no FSIA jurisdiction based on detention of aircraft creating financial impact in United States); *International Housing Limited v. Rafidain Bank Iraq,* 893 F.2d 8, 12 (2d Cir.1989) (mere payment of funds into United States bank does not create FSIA jurisdiction) *with Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 151 (2d Cir.1991) (issuance of debt instruments to United States creditors creates FSIA jurisdiction), *cert. granted,* — U.S. —, 112 S.Ct. 858, 116 L.Ed.2d 766 (1992); *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1019–1020 (2d Cir.1991) (sale of Bolivian promissory notes in United States creates FSIA jurisdiction). The Second Circuit also has held that FSIA section 1606 requires that forum state choice of law rules be applied in non-federal question FSIA cases. *See Barkanic v. General Administration of Civil Aviation of People's Republic of China,* 923 F.2d 957, 961 (2d Cir.1991).

While these issues have been clarified by decisional law, the issue raised by Walpex appears to be one of first impression. *Cf. Starrett v. Iberia Airlines of Spain,* 756 F.Supp. 292, 294 (S.D.Tex.1989) ("This Court need not decide the difficult issue of the purpose of § 1606 in this regard."). In the instant case, New York state choice of law rules point to Bolivian law, which establishes different rules of primary conduct for governmental agencies and similarly situated individuals. *Cf. Hanna v. Plumer,* 380 U.S. 460, 476, 85 S.Ct. 1136, 1146, 14 L.Ed.2d 8 (1965) (Harlan, J., concurring) (arguing that state law should control "substantive regulation of ... primary conduct"). Thus, while formation of a contract with an instrumentality of the Bolivian government requires certain formalities, including a witnessed, notarized writing that is recorded as a public deed and choice of law and forum clauses, Walpex argues that section 1606 requires the Court to disregard these rules of primary conduct and to treat YPFB as though it were a Bolivian individual.

The first step in discerning the purpose of section 1606 in this regard is the language of the Act, which provides that

> [a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of [the FSIA], the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances....

To discern the purpose of section 1606, the Court next turns to the legislative history. The goals of the FSIA are to

> set[ ] forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states.... [and to prescribe] the jurisdiction of U.S. district courts in cases involving foreign states, procedures for commencing a lawsuit against foreign states ... and circumstances under which attachment and execution may be obtained against the property of foreign states to satisfy a judgment.

H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 12, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6610–11. The FSIA codified "the so-called 'restrictive' principle of sovereign immunity.... [whereby] the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts." *Id.* at 6, *reprinted in* 1976 U.S.C.C.A.N. 6605. In addition to regularizing rules of sovereign immunity, by shifting decision-making from the Executive to the Judiciary and providing statutory rules for personal and subject matter jurisdiction in sovereign immunity cases, the Act also sought to remedy "the present predicament of a plaintiff who has obtained a judgment against a foreign state ... [that] enjoys absolute immunity from execution, even in ordinary commercial litigation." *Id.* at 8, *reprinted in* 1976 U.S.C.C.A.N. at 6606.

While the language of Section 1606 provides for liability for foreign governments to the same extent as similarly situated private individuals, the legislative history makes clear that the FSIA was "not intended to affect the substantive law of liability." *Id.* at 12, *reprinted in* 1976 U.S.C.C.A.N. at 6610. It therefore appears

to the Court that section 1606 was intended to create rules governing the liability of foreign governments for damages, and not to change the rules of primary conduct that apply to foreign governments. For example, the title of section 1606 is "Extent of Liability," which indicates that Congress was concerned in this section with codifying rules covering damages. In fact, this conclusion is buttressed by the structure of section 1606, which discusses liability for punitive, actual and compensatory damages. The legislative history lends further support to this conclusion, addressing damages, costs, pre-judgment interest, and means of enforcement, including injunction and specific performance. *See id.* at 11, 22, *reprinted in* 1976 U.S.C.C.A.N. 6611, 6621.

While the question currently confronting the Court has not been squarely addressed before, various courts have examined the impact of section 1606 on the substantive law to be applied to a case. For example, the Supreme Court has cited the legislative history of section 1606 with approval in stating that:

> The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state.

*First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 622 n. 11, 103 S.Ct. 2591, 2597, 2598 n. 11, 77 L.Ed.2d 46 (1983); *accord Liu v. Republic of China,* 892 F.2d 1419, 1425 (9th Cir.1989) ("The FSIA does not create a federal rule of liability to be applied in an action involving a foreign state."), *cert. dismissed,* — U.S. —, 111 S.Ct. 27, 111 L.Ed.2d 840 (1991); *Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320, 326 (2d Cir.1981) (FSIA provides access to United States courts but does not affect substantive rules of liability), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In fact, in the FSIA context, the term "liability" has been used to signify the equivalent of damages. *See Bowers v. Transportes Navieros Ecuadorianos (Transnave),* 719 F.Supp. 166, 171 (S.D.N.Y.1989).

The Court therefore concludes that section 1606 is concerned with the liability of a foreign state for damages, and does not alter basic rules of primary conduct that govern contract formation. In fact, this conclusion is consistent both with the language and purpose of the FSIA and with basic contract principles, which establish that the issue of contract formation precedes, and is distinct from, the issue of liability for breach. *See Valashinas v. Koniuto,* 308 N.Y. 233, 246, 124 N.E.2d 300 (1954) ("In the world of business where the formation of a contract through offer and acceptance may entail great liability, the courts have been most careful in withholding a decision that a contract has been entered into between an offeror and an offeree unless the offer is accepted in the form and content in which it is made."); *E. Williamson Roofing and Sheet Metal Co. v. Town of Parish,* 139 A.D.2d 97, 530 N.Y.S.2d 720 (4th Dept.1988) (where statutory requirements not adhered to "*prior* to formation or execution of the contract, no liability can arise on a theory of contractual breach") (emphasis in original).

Moreover, this Court's refusal to ignore Bolivian rules of contract comports with the realities of the Walpex–YPFB transaction. There is no dispute concerning the fact that YPFB placed Spanish language advertisements in the Bolivian press to solicit bids for the supply of pipe, and that Walpex, through a Bolivian agent, took steps to procure this contract in Bolivia, cognizant of the fact that its bargaining partner was the Bolivian government. In fact, Walpex has admitted that its Bolivian agent "appeared at the YPFB offices ... to satisfy any formalities ... including the signing of any appropriate formal instrument." Walpex R. 3(g) Statement ¶ 9. To ignore the realities of the bargaining process between Walpex and YPFB and the statutory requirements of the Bolivian legal system in favor of the fiction that YPFB was a private individual would obscure the Court's inquiry into the intentions of the parties and elevate a flawed

interpretation of the FSIA over the substance of this transaction. The Court therefore rejects plaintiff's suggestion that formation of the instant contract should be determined based on the fiction that the Bolivian government was actually a Bolivian individual.

C. *Merits of Cross–Motions for Summary Judgment*

The Court next considers the merits of the parties' cross-motions for summary judgment, turning first to the breach of contract theory of the case.[4] Based on the preceding analysis of Bolivian law, it is clear that a contract involving an agency of the Bolivian government requires certain formalities, including a notarized, witnessed writing that is recorded as a public deed and inclusion of choice of law and choice of forum clauses. However, both Walpex and YPFB agree that these requirements were not adhered to. Thus, there can be no dispute that, under clearly established principles of Bolivian law, the breach of contract action must fail.

Walpex attempts to avoid this result by asserting that "YPFB never indicated that it intended to be bound *only* upon execution of a formally executed contract, and nowhere in the Regulations or Specifications produced by YPFB does such a requirement appear." Plaintiff's Motion, at 20 (emphasis in original). However, all of the evidence before the Court directly supports the contrary result, and the only inference that can be drawn is that YPFB did not intend to be bound in the absence of these formalities. For example, the Specifications distributed as part of the bidding process unequivocally stated that presentation of a bid signified submission to rules of Bolivian law, and to regulations concerning governance of YPFB. Moreover, these controlling authorities require execution of a notarized, witnessed contract recorded as a public deed to form a valid contract with an instrumentality of the Bolivian government, with the absence thereof voiding the contract. Thus, because there is no disputed issue of material fact concerning the absence of a notarized contract, and because the controlling documents make clear that YPFB did not intend to be bound in the absence of such a writing, summary judgment in favor of defendant on the breach of contract claim hereby is granted.

However, the fact that the claim for breach of contract must fail does not lead inexorably to the conclusion that Walpex has no cause of action. In addition to its breach of contract claim, plaintiff has asserted a claim for recovery based on the allegation that YPFB acted in bad faith, and should be equitably estopped from denying the obligation it assumed with respect to Walpex.[5] For example, Walpex has produced various internal memoranda demonstrating that YPFB decided, soon after the award, to suspend the purchase of the pipe, while publicly adhering to the position that the purchase would proceed. Moreover, plaintiff claims that, because it was not informed of defendant's intention to suspend the purchase, Walpex incurred various expenses, including the contract with Vinson and the cost of the performance bond. This evidence clearly raises disputed issues of material fact under Bolivian law concerning whether YPFB acted in bad faith and caused injury to Walpex. Thus, after full discovery, the fact-finder will be required to determine whether defendant's actions were sufficiently misleading that YPFB should be held liable for damages to Walpex. The Court therefore rejects defendant's conclusion that summary judgment is appropriate because the

4. Plaintiff's expert on Bolivian law concludes that resolution of this case requires determination of disputed issues of material fact. *See* Garro Affidavit ¶ 49 ("If a Bolivian court were to find, as a matter of fact ...; if the question were to be left to the discretion of the trier of facts"). The Court therefore is perplexed about the basis for plaintiff's summary judgment motion.

5. The Court takes this opportunity to reject defendant's assertion that Walpex has not properly raised this theory of the case. *See* Defendant's Reply, at 8. The plain language of plaintiff's complaint asserts that it took actions in reliance on YPFB's award of the bid. *See* Complaint ¶¶ 9–13. Thus, under Fed.R.Civ.P. 8, YPFB had adequate notice of this claim for relief.

facts alleged by Walpex "do not come close to satisfying the heavy burden for alleging or proving [bad faith] by YPFB." Palacios Affidavit ¶ 125.

To support a recovery, however, Walpex will also have to overcome hurdles of contributory negligence and assumption of risk. Based on the evidence currently before the Court, a disputed issue of material fact exists concerning the reasonableness of plaintiff's reliance on YPFB's position. For example, YPFB has introduced evidence in support of the assertion that Walpex knew that it should not have entered into binding obligations with suppliers until a notarized contract was executed with YPFB. Defendant therefore asserts that plaintiff's execution of a supply contract in anticipation of the completion of contract formalities concerning the Walpex–YPFB contract was unreasonable, and that any recovery by the plaintiff should be limited to the cost of the performance bond procured by Walpex. Based on these disputed issues of material fact, the Court denies the cross-motions for summary judgment on the bad faith/equitable estoppel theory of the case.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment on the breach of contract claim hereby is denied, and defendant's cross-motion for summary judgment dismissing the breach of contract theory of the case hereby is granted. The parties' cross-motions for summary judgment on the bad faith/equitable estoppel theory of the case hereby are denied.

SO ORDERED.