**WALPEX TRADING CO., Plaintiff,**

v.

**YACIMIENTOS PETROLIFEROS FISCALES BOLIVIANOS, Defendant.**

**No. 84 Civ. 4364 (PKL).**

United States District Court, S.D. New York.

Feb. 1, 1991.

Lane & Mittendorf, New York City (Edward C. Cerny III, of counsel), for plaintiff.

Gibson, Dunn & Crutcher, New York City (Mitchell A. Karlan, Dvora Wolff Rabino, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge.

In a previous opinion in this matter, this Court noted that "[t]his extraordinary case has, over the course of several years, consumed more legal, financial and judicial resources in the litigation of essentially threshold issues than scores of cases that have been filed, resolved and forgotten in this Court during the same time period." *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 385 (S.D.N.Y.1989). The most recent developments constitute an additional chapter in the saga.

This is a breach of contract action brought by Walpex Trading Company ("Walpex"), an American export company, against Yacimientos Petroliferos Fiscales Bolivianos ("YPFB"), an instrumentality of the Bolivian government. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1330(a) and section 1605(a)(2) of the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602–1611. *See Walpex, supra.*

Defendant now moves for summary judgment and dismissal of the case pursuant to Fed.R.Civ.P. 56. Plaintiff opposes defendant's motion and cross-moves for summary judgment on its breach of contract claim. This opinion addresses only defendant's motion.[1]

---

**1.** Plaintiff was notified by Magistrate Kathleen A. Roberts that

[b]ecause plaintiff did not seek or receive permission to file its cross-motion for summary judgment on the merits of the action, and because discovery has not been completed

with respect to the issues raised therein, the cross-motion will be held in abeyance pending Judge Leisure's decision on defendant's motion.

Order of Magistrate Kathleen A. Roberts, dated April 23, 1990.

## BACKGROUND

Plaintiff is a New York corporation engaged in international commerce. Defendant is a Bolivian government-owned corporation that purchases supplies for the Bolivian government's national oil program. In or around February 1982, defendant publicly invited bids for the supply of piping to be used by the Bolivian oil well industry. The invitation appeared in Spanish in various Bolivian newspapers. As translated into English, it provided as follows:

### INVITATION

### PUBLIC BID NO. 120–81

### SUPPLY OF: PRODUCTION PIPING

Interested firms hereby are invited to present bids of the supply of:

### PRODUCTION PIPING

The List of Specifications may be obtained from the Technical Consulting office of the Materials Department, located at the YPFB building, 4th Floor, 185 Bueno Street.

Bids with the formal requirements set forth in the List of Specifications will be received in the Technical Consulting office until 5:00 p.m., March 2, 1982.

*Walpex, supra,* 712 F.Supp. at 387 n. 2.

The Specifications referred to in the Invitation provided in pertinent part:

Paragraph 1.0

The bidding is ruled by the Regulations for Acquisitions and Contracts of YPFB, approved by Decree Law 16857 of July 20, 1979 and by related norms in force in the Country.

\* \* \* \* \* \*

Paragraph 2.3.3.

The presentation of a bid implies the bidder's submission to the legal system cited in paragraph 1.0 and to all laws in force in the country, as well as to all

---

**2.** Paragraph 2.3.3 is repeated in Article 39 of the Regulations referred to in ¶ 1.0 of the Specifications.

**3.** This paragraph is repeated in Article 23 and 74 of the Bolivian Procurement Law for the

---

requirements in this list of Specifications.[2]

Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.") at 4.

Article 120 of the Regulations referred to in ¶ 1.0 of the Specifications provides:

With respect to contracts with foreign organizations, an express clause shall be included to the effect that all issues emerging from the contract shall be subject to Bolivian law and submitted to the jurisdiction of the courts in Bolivia.[3]

Affidavit of Sergio Palacios De Vizzio, sworn to on December 19, 1989 ("Palacios de Vizzio Aff.") ¶ 18.

*The Alleged Formation and Breach of Contract*

Walpex received YPFB's invitation for bids and the requisite Specifications through its Bolivian sales agent, Compania de Representaciones Internacionales, S.R.L. ("COREIN"). Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plain. Mem.") at 4. In March 1982, Walpex submitted its bid for the supply contract through COREIN, and on April 7, 1982, YPFB advised COREIN, in writing, that Walpex had been awarded the contract and that COREIN should come to YPFB's offices in La Paz to sign the formal documents. *Walpex, supra,* 712 F.Supp. at 387. No formal written contract was ever signed.

During the next fifteen months, YPFB requested numerous extensions on the deadline for payment of the full purchase price of the tubing. Affidavit of F. Walter Piraino, sworn to on April 20, 1990 ("Piraino Aff."), ¶¶ 1, 14. Finally, on July 28, 1983, YPFB formally repudiated the contract, stating that it was unable to obtain financing for the project from the World Bank. *Id.* ¶ 15.

---

Public Sector, approved by Decree Law No. 15223 on December 30, 1977. *See* Def. Mem. at 5.

Walpex argues that the submission and acceptance of its bid formed a valid contract for the sale of 88,500 feet of three and one half inch seamless steel tubing and accessories. In addition, plaintiff alleges that it took steps in reliance on the contract, including Walpex's entry into a supply contract with Vinson International Supply Company, a Texas pipe manufacturer, and several preparatory actions in Bolivia, such as obtaining a Bolivian corporate charter and designating COREIN as its authorized agent with power of attorney. Walpex also asserts that to satisfy YPFB's requirement of a performance bond, it established an irrevocable letter of credit with Chase Manhattan Bank payable to YPFB. Piraino Aff. ¶¶ 8, 9. This letter of credit was extended a number of times, and was eventually cancelled after YPFB's repudiation.

Plaintiff alleges that during the fifteen months YPFB was seeking extensions of the performance bond and of its time to pay, YPFB had already decided not to perform under the alleged contract. Plaintiff further alleges that YPFB had made this decision even though it could have obtained the necessary financing from sources other than the World Bank. As a result of its reliance on the contract, induced by YPFB's apparent intent to perform, plaintiff argues that it was "prohibited ... from mitigating its damages by selling the goods in the falling market," and that by the time YPFB formally repudiated the contract, the market for tubing had collapsed completely. Piraino Aff. ¶¶ 9, 14.

*Defendant's Arguments*

Defendant denies the existence of an enforceable contract in the absence of a formal written agreement, but argues that even if a contract is deemed to exist, plaintiff's action must still be dismissed. Defendant asserts that the Invitation made ¶¶ 1.0 and 2.3.3 of the Specifications formal elements of any valid bid. Defendant's Reply Memorandum in Support of Motion for Summary Judgment ("Reply") at 6–7. Similarly, defendant contends, ¶ 1.0 incorporated Article 120 of the Regulations into plaintiff's bid. Therefore, defendant argues, if a contract exists, it must contain these three clauses, which it contends mandate choice of Bolivian law and make Bolivia the exclusive forum for any disputes arising out of such a contract. In the alternative, defendant argues, even if the Court finds no mandatory choice of forum clause, plaintiff's action must be dismissed under Bolivian law, which, it claims, invalidates any contract between defendant and a foreign party that does not contain such a clause.

## DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Choice of Law

■ Choice of law clauses are routinely enforced by the courts of this Circuit, "if there is a reasonable basis for the choice." *Morgan Guaranty Trust Co. v. Republic of Palau*, 693 F.Supp. 1479, 1494 (S.D.N.Y. 1988) (citing Restatement (Second) of Conflict of Laws § 187 (1971)). New York courts also defer to choice of law clauses if the state whose law is thus selected has sufficient contacts with the transaction. *See, e.g., Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir.1984); *600 Grant St. Assocs. Ltd. Partnership v. Leon–Dielmann Inv. Partnership*, 681 F.Supp. 1062, 1064 (S.D.N.Y.

1988). These cases, however, have involved explicit provisions, clearly incorporated into written contracts signed by the parties. No such document exists in this case. However, the Court need not decide the existence and validity of a choice of law clause, because the Court finds that this action should be governed by Bolivian law even in the absence of such a clause.

In a recent case, the Second Circuit held that in cases in which the substantive claim at issue does not arise under federal law, "the FSIA requires courts to apply the choice of law rules of the forum state." *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 961 (2d Cir.1991); *see also Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320, 326 n. 19 (2d Cir.1981) (suggesting that under FSIA, "state substantive law, including choice of law rules, will be applied if the issue before the court is non-federal"), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In this case, application of New York choice of law analysis is required.

When a contract does not contain a valid choice-of-law provision, New York courts choose the controlling law by evaluating the contacts and interests of the competing fora in the transaction in question. In contract cases, New York courts use a "center of gravity" or "grouping of contacts" analysis, *see Transatlantic Cement, Inc. v. Lambert Freres et Cie.,* 462 F.Supp. 363, 364–65 (S.D.N.Y.1978) (quoting *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99 (1954)), and apply " ' "the law of the jurisdiction having the greatest interest in the litigation." ' " *ICC Indus. v. GATX Terminals Corp.,* 690 F.Supp. 1282, 1285 (S.D.N.Y.1988) (quoting *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985) (quoting *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.,* 37 N.Y.2d 220, 226–27, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 172–73 (1975))).

Under this approach, the Court concludes that Bolivian law governs the substantive issues in this action. Bolivia's contacts with the transaction are numerous. The defendant is a Bolivian resident and an instrumentality of the Bolivian government. YPFB's solicitation of bids was published only in Spanish, in Bolivia. Both Walpex's submission of its bid through its agent, COREIN, and YPFB's acceptance of the bid took place in Bolivia. Thus, even under plaintiff's theory, all of the events underlying the formation of the alleged contract took place in Bolivia. *See* Plain. Mem. at 24. In addition, plaintiff alleges performance of several preparatory acts in Bolivia, such as obtaining a Bolivian corporate charter and designating COREIN as its authorized representative with power of attorney.

In contrast, New York state has only two significant contacts with the transaction: (1) plaintiff is a New York resident, and (2) Walpex's international letter of credit was obtained from a New York bank. The parties disagree as to whether the subject of the contract is the production of the piping in the United States or the supply of the piping to Bolivia for use in the Bolivian oil industry. This issue is of little significance for the purpose of choosing the applicable law, since the piping was manufactured in Texas and was to be shipped directly from Houston to Bolivia. Piraino Aff. ¶ 6. Thus, the extent of New York's contacts with this case seems to be that plaintiff, a middleman between a Texas manufacturer and a Bolivian consumer, is a New York resident that used a New York bank to issue a letter of credit.

The Court therefore finds that Bolivia's contacts with the transaction are greater in number and significance than New York's, and notes that a similar result has often been reached under New York choice of law analysis. *See Transatlantic Cement, supra,* 462 F.Supp. at 365 (under New York conflicts rules, French law governed contract dispute where defendants were French citizens, preliminary negotiations occurred in France and the alleged agreement occurred in France); *Teledyne Indus. v. Eon Corp.,* 373 F.Supp. 191, 200 (S.D.N.Y.1974) (under New York conflicts rules, California law governed where contract between California plaintiff and New York

defendant with California division was negotiated and signed in California).

Bolivia's interest in having the litigation governed by its laws also outweighs that of New York. The piping involved in the contract was to be used in Bolivia's national oil industry. The importance of this program to the Bolivian government is indicated by the fact that the government established a multi-million dollar corporation employing approximately 7200 people in five international offices. *Walpex, supra,* 712 F.Supp. at 386–87. Moreover, the significance of the program is reflected by the fact that the government saw fit to enact numerous laws and regulations specifically addressing YPFB's purchasing powers and procedures. *See* Palacios de Vizzio Aff. ¶ 9.

New York's main interest appears to be in protecting the financial interests of one of its residents. Plaintiff argues that applying Bolivian law to this action would "overrid[e] [New York's] interest in applying its own law to international commercial transactions." Plain. Mem. at 22. The cases cited by plaintiff for this proposition are inapposite here for two reasons. First, those cases involved situations in which the defendant approached a New York resident in order to conduct business within New York state.[4] In the instant case, plaintiff approached defendant in Bolivia to take advantage of a profitable business opportunity available in that forum.

More importantly, in the cases relied upon by plaintiff, "New York's recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world" was threatened. *Ehrlich–Bober & Co. v. University of Houston,* 49 N.Y.2d 574, 581, 427 N.Y.S.2d 604, 608, 404 N.E.2d 726, 730 (1980). No

such threat appears present here. It is doubtful that foreign parties will lose confidence in New York's financial institutions or its judicial system if foreign law is applied in a case in which a New York resident went outside of New York to approach and contract with a party in a foreign country. While New York has a strong interest in regulating transactions conducted within its own borders, there is no indication that New York has a paramount interest in applying its law whenever a New York business entity contracts with anyone anywhere. The resolution of this case will be more likely to affect international confidence in the stability and security of Bolivia's commercial and legal systems than those of New York.

Plaintiff also argues that imposition of Bolivian law would violate New York public policy. New York courts will decline to apply foreign law that would otherwise govern if that law conflicts with a strong public policy of the forum. *See Ehrlich–Bober, supra,* 49 N.Y.2d at 580, 427 N.Y.S.2d at 608, 404 N.E.2d at 730; *J. Zeevi, supra,* 37 N.Y.2d at 227, 371 N.Y.S.2d at 899, 333 N.E.2d at 173. However, "[i]n search of the public policy of the State, courts of course are not free to indulge in mere individual notions of expediency and fairness but must look to the law as expressed in statute and judicial decision.... Nor ... may it be said that in case of conflict New York's policy will invariably prevail ... in the face of a strong assertion of interest by the other jurisdiction." *Ehrlich–Bober,* 49 N.Y.2d at 580, 427 N.Y.S.2d at 608, 404 N.E.2d at 730. Analysis of policy conflicts thus overlaps with interest analysis, and requires a clear showing of a conflict once foreign law has been demonstrated to apply.

---

**4.** *See Ehrlich–Bober & Co. v. University of Houston,* 49 N.Y.2d 574, 582, 427 N.Y.S.2d 604, 609, 404 N.E.2d 726, 731 (1980) (securities transactions arose from defendant's phone calls to New York stock broker, price of the securities was paid in New York, and securities were delivered and to be repurchased in New York); *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168 (1975) (Ugandan bank opened and later unilaterally attempted to cancel irrevocable letter of credit with New York bank); *Pallavicini v. International Tel. & Tel. Corp.,* 41 A.D.2d 66, 341 N.Y.S.2d 281 (1973) (plaintiff wrote letters and made phone calls from New York City in response to request by defendant); *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 376–78, 300 N.Y.S.2d 817, 820–21, 248 N.E.2d 576, 578–79 (1969) (New Jersey defendant approached New York middleman in response to advertisement placed in New York newspaper).

Although Walpex's memorandum of law asserts its conclusions as to the proper resolution of this dispute under New York law, it fails to make any argument as to the outcome of the case under Bolivian law, or in exactly what way such an outcome would violate New York public policy. Nor does it concede that defendant's construction of Bolivian law is correct. As discussed in Part D of this opinion, *infra,* this Court does not conclude on the record before it that Bolivian law is so certain to deprive plaintiff of relief it might obtain under New York law that an injustice amounting to a violation of New York public policy will occur.

■ Walpex also argues that "[d]efendant's belated, unilateral attempt to impose" Bolivian law "is improper, unjust, unreasonable, and unfair under the facts and circumstances at bar." Plain. Mem. at 21. Plaintiff was fully informed before it contracted with YPFB that YPFB intended Bolivian law to govern the contract. The Invitation explicitly stated that bids had to conform to the Specifications, which in turn clearly stated on the first page: "The presentation of a bid implies the bidder's submission to the legal system cited in paragraph 1.0 and to all laws in force in the country, as well as to all requirements in this list of Specifications." Specifications ¶ 2.3.3. Moreover, the parties had signed another supply contract on March 26, 1982, which included a clear choice-of-Bolivian-law provision. Palacios de Vizzio Aff. ¶¶ 22–26. Consequently, because Walpex knew, or should have known, before it submitted its bid that YPFB intended that any dispute resulting from the bidding process be governed by Bolivian law, the Court does not find it unfair, unreasonable or unjust to apply Bolivian law in this case.

Therefore, because Bolivia has greater contacts with the case, and Bolivia has the paramount interest in having the action litigated under its laws, and the imposition of Bolivian law in this action has not been shown to conflict with New York public policy, the Court finds that Bolivian law should govern this case.

## C. Choice of Forum

■ Having decided that Bolivian law governs the substantive issues in this dispute, the Court must turn to the question of whether Bolivia is the exclusive forum for any action arising out of the alleged contract.

In an earlier opinion, this Court denied defendant's motion to dismiss the action on *forum non conveniens* grounds. *See Walpex, supra,* 712 F.Supp. at 392–94. However, the issue of a mandatory forum selection clause raised in the instant motion was not before the Court on the prior motion, and constitutes a separate consideration from the Court's earlier conclusion that "litigation in this forum is permissible." *Id.* at 393.

The Supreme Court has held that forum selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud, undue influence, or overweening bargaining power." *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 12–13, 92 S.Ct. 1907, 1914–15, 32 L.Ed.2d 513 (1972). This language has been further explicated by the Court to mean that a "forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 2457 n. 14, 41 L.Ed.2d 270 (1974) (emphasis in original); *see also AVC Nederland B.V. v. Atrium Inv. Partnership,* 740 F.2d 148, 156–58 (2d Cir.1984) (Friendly, J.).

In this case, however, just as no written instrument signed by the parties contains a choice of law clause, no such instrument containing a choice of forum provision has been produced. While it may be true that, as defendant argues, regulations would have mandated inclusion of such a clause in any formal contract, this Court cannot pass on the validity of a clause that might have been or should have been included in a nonexistent document. Thus, defendant's motion for summary judgment dismissing this action on the basis of an exclusive forum clause is denied.

*D. Unenforceability*

 Defendant's argument that the alleged contract is unenforceable if no valid choice of forum clause exists goes to the merits of this action, which must be decided according to Bolivian law.

Plaintiff has not presented any arguments founded on Bolivian law, either in the form of expert testimony or as citations to cases or statutes, despite notice given as long ago as defendant's previous motion to dismiss that defendant contended that Bolivian law controlled. *See Walpex, supra,* 712 F.Supp. at 393. Provided that reasonable notice is given, a party may rely on the law of a foreign country, and this Court "may consider any relevant material or source, including testimony," in determining foreign law. Fed.R.Civ.P. 44.1. The only material offered to the Court concerning Bolivian law is the affidavit of Sergio Palacios de Vizzio, *supra,* submitted in support of defendant's motion.

Mr. Palacios de Vizzio, an attorney admitted to practice in Bolivia and in New York, and licensed by the Appellate Division of the Supreme Court of New York as a Consultant on Bolivian law, does indeed conclude that contracts between YPFB and foreign suppliers must contain mandatory choice-of-Bolivian-law and -forum clauses, and that they are void and unenforceable without such clauses. *See* Palacios de Vizzio Aff. ¶¶ 18–20.

While the Court might be justified in relying on defendant's expert as to this point, defendant has failed to convince the Court that Bolivian courts would necessarily deny plaintiff any relief in a case in which plaintiff's allegations, if proven, may establish that defendant in bad faith induced plaintiff to rely on its promised award of the contract. Defendant has failed to demonstrate that it is entitled to summary judgment on this issue as a matter of law, and its motion accordingly must be denied as to this point.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment dismissing the complaint is denied.

The parties are directed to appear for a status conference before this Court on March 1, 1991, at 3:00 p.m.

SO ORDERED.