**Tarek REED, Plaintiff,**

**v.**

**ISLAMIC REPUBLIC OF IRAN et al., Defendants.**

**Civil Action No. 03–2657 (RMU).**

United States District Court, District of Columbia.

July 17, 2006.

Emil Hirsch, Paul L. Knight, O'Connor & Hannan, LLP, Washington, DC, for Plaintiff.

### *MEMORANDUM OPINION*

URBINA, District Judge.

### DENYING THE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

## I. INTRODUCTION

This case involves the defendant's alleged support of Hizbollah, a terrorist group that abducted, held and tortured Frank Reed, the plaintiff's father, for more than three years. The plaintiff seeks damages from the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS"), collectively "the defendants," for injuries suffered by the plaintiff resulting from his father's kidnaping.

Presently before the court is the plaintiff's motion for default judgment. The plaintiff argues that he is entitled to default judgment as to three distinct causes of action. Because the plaintiff's stated causes of action are not viable causes of action, the court denies the plaintiff's motion for default judgment.

## II. BACKGROUND

### A. Factual Background

The plaintiff alleges as follows. On September 9, 1986, Frank Reed was kidnapped by Hizbollah in Lebanon on his way to a golf course. Pl.'s Mot., Attach. A (Fifi Reed Aff.) ¶ 4. During 1,330 days of confinement, Reed was at times blindfolded, resulting in several eye infections, and he was subjected to routine beatings by his captors, who assumed that he worked for the CIA. Pl.'s Mot., Attach. B, (Frank Reed Test.) at 97–99 When Reed once saw one of his captors' faces, he was beaten for four straight days, resulting in kidney damage and causing him to bleed when urinating. *Id.* at 103. Reed's captors beat him with a grenade, causing him partial hearing loss, kicked him in the ribs causing his ribs to protrude through his skin, and placed a boiling tea kettle on his shoulders causing permanent scarring. *Id.* at 104–106. Reed was housed in a small cell and chained to the wall such that he was unable to sit down. *Id.* at 107. Following an escape attempt, Reed was exposed to cold weather wearing little

clothing. *Id.* In addition to this physical torture, Reed was psychologically tortured; his captors promised him he would be released, only to renege repeatedly on that promise. *Id.* At the conclusion of his captivity, Reed had lost more than fifty pounds. *Id.* at 105.

The plaintiff alleges that Iran directed the establishment of Hizbollah with the purpose of eradicating western cultural influence in Lebanon. Compl. ¶ 4. Iran provided between fifty million and one hundred million dollars per year to Hizbollah. Pl. Mot., Attach. F (Hurley Test.) at 15; *Id.*, Attach. E, (Clawson Test.) at 72–78. Reed's kidnaping was directed at the "highest levels" of the Iranian government and with the assistance of the MOIS. Hurley Test. at 20.

Tarek Reed was six years old when his father was kidnaped. Pl. Mot., Attach., C (Fifi Reed Test.) at 97; *Id.*, Attach. J at 17. Throughout Reed's detention, the plaintiff's mother told him that his father was away working for the family, and "never told [him] that his dad was kidnaped." Fifi Reed Test. at 131. Thus, the plaintiff remained unaware of Reed's kidnaping through its duration. *Id.* After hearing rumors about his father at school, his mother told him that "[d]addy is somewhere. He is in a house. He is not being harmed, but he can't leave." *Id.*

Frank Reed was released from captivity after three and a half years and he promptly returned to the United States to rejoin his family. *Id.* at 115. Doctors in the United States found that he had been poisoned with arsenic and that he suffered from chronic depression and post-traumatic stress syndrome. *Id.* at 117–125.

Frank Reed's behavior changed drastically following his return to the United States. Fifi Reed Test. at 133. He started drinking excessively and rarely left his house, he would "walk out on the streets barefooted," and he would randomly just lie down in the grass. *Id.* at 135. He had difficulty sitting still, and could not walk, run, or dance—activities he regularly participated in prior to his abduction. *Id.* at 141. Reed is currently receiving social security disability benefits. Frank Reed Test. at 124.

The plaintiff, a teenager when his father returned to the United States, was deeply affected by these changes. Fifi Reed Test. at 140. Fellow students in school would call attention to Frank Reed's plight, saying, "we saw your father in a magazine, and he was picked up by the police." *Id.* As a result of the changes to Frank Reed, the plaintiff began alienating his father, *id.*, sometimes confronting him saying, "[w]hy are you killing yourself [and] making yourself end up in the hospital." Pl.'s Mot., Attach. L (Price Rep.) at 7.

The plaintiff's academics were also affected. *Id.* at 9. In 1993, the plaintiff received his first psychiatric examination, which determined that he had a loss of focus. *Id.* at 3. According to the plaintiff, these academic difficulties affected him professionally and have limited his career choices. *Id.* at 9. He attended college part-time but dropped out due to chronic depression. Pl.'s Mot., Attach. M at 9. As a result of his father's illness, the plaintiff engaged in self-destructive and self-defeating behavior. Price Rep. at 10. Significant consumption of alcohol and marijuana while a junior and senior in high school coincided with many of his father's most severe psychiatric difficulties. *Id.* at 6. The plaintiff became "terribly upset" when his father was not doing well and the plaintiff held chronic feelings of helplessness and anger toward his father's situation. *Id.* at 10.

## B. Procedural Background

The plaintiff filed a complaint against defendants Iran, MOIS, Ali Fallahian–

Khuzestani, Ali Akbar Hashemi–Rafsanjani, the Iranian Revolutionary Guard Corp., and Mohammad Mohammadi Nik on December 30, 2003. Because the defendants failed to appear or respond to the plaintiff's complaint, the Clerk of the Court entered default on July 15, 2004.

On June 13, 2005, the plaintiff filed a notice of voluntarily dismissal as to defendants Mohammad Mohammadi Nik, Ali Fallahian–Khuzestani, Ali Akbar Hashemi–Rafjsani, and the Iranian Revolutionary Guard Corp. Additionally, following the D.C. Circuit's ruling in *Cicippio–Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033 (D.C.Cir.2004), the plaintiff abjured his claim for relief under the Flatow Amendment as an independent cause of action. Thus, as to the remaining defendants, Iran and MOIS, the plaintiff's remaining claims are hostage taking, torture, arbitrary and prolonged detention, intentional infliction of emotional distress and solatium.[1] The plaintiff has filed a motion for default judgement. The court now turns to that motion.

### III. ANALYSIS

#### A. Legal Standard for a Default Judgment

■ A court shall not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232–33 (D.C.Cir.2003). This standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e). *Hill v. Republic of Iraq,* 328 F.3d 680, 684 (D.C.Cir.2003). In evaluating the plain-

tiff's proof, the court may "accept as true the plaintiff's uncontroverted evidence." *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 100 (D.D.C.2000). In FSIA default judgment proceedings such as this, the plaintiff may establish proof by affidavit. *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19 (D.D.C.2002).

■ In suits against international governments or citizens, the claimant needs to establish that (1) "there has been a waiver of sovereign immunity" and (2) "the source of substantive law upon which the claimant relies provides an avenue for relief." *FDIC v. Meyer,* 510 U.S. 471, 484, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).

#### B. Foreign Sovereign Immunities Act

■ The Foreign Sovereign Immunities Act ("FSIA") is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The basic premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless the action falls under one of the specific exceptions enumerated in the statute. 28 U.S.C. § 1604; *Price v. Socialist People's Libyan Arab Jamahiriya,* 389 F.3d 192, 196 (D.C.Cir. 2004). If the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over the action. 28 U.S.C. §§ 1330, 1604; *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38, 42 (D.D.C. 2000) (citing *Amerada Hess,* 488 U.S. at 434–35, 109 S.Ct. 683).

■ Under the FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."

---

**1.** Solatium is defined as "[c]ompensation, esp., damages allowed for hurt feelings or grief, as distinguished from damages for phys-
ical injury." BLACK'S LAW DICTIONARY 1397 (7th ed.1999).

*Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C.Cir.2000) (quoting *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990)). The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations. *Foremost–McKesson,* 905 F.2d at 449. The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial. *Id.* (quoting *Prakash v. Am. Univ.,* 727 F.2d 1174, 1179 (D.C.Cir.1984)).

■ The state sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), and enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996), qualifies this case for the court's intervention. This statute provides that foreign sovereigns are not immune when

> [m]oney damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency [.]

28 U.S.C. § 1605(a)(7).

The statute gives three additional requirements for the exception to apply: (1) the foreign state must be designated as a state sponsor of terrorism at the time the act occurred or was designated as such as a result of such an act; (2) the plaintiff must afford the foreign state a reasonable opportunity to arbitrate the dispute if the act occurred within that state's territory; and (3) either the claimant or the victim must have been a United States national at the time the act occurred. 28 U.S.C. § 1605(a)(7)(A)-(B).

■ Section 1605(a)(7) does not create a federal cause of action against foreign states, but operates as a "pass-through" statute, granting jurisdiction over these previously immune entities against whom claims may be brought.[2] *Cicippio–Puleo,* 353 F.3d 1024, 1033 (D.C.Cir.2004); *see also Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 12 (2d Cir.1996) (stating that "[t]he FSIA ... operates as a 'pass-through' to state law principles"). Section 1606 of the FSIA provides the standard of liability for claims for relief brought against foreign states:

> [a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances[.]

28 U.S.C. § 1606.

As Judge Edwards expressed for the majority in *Acree v. Republic of Iraq,* the court "cannot ignore the magnitude of [ ] default judgment or its impact on the United States' conduct of foreign policy where the law is indisputably clear." 370 F.3d 41, 60 (D.C.Cir.2004).

---

**2.** Although the D.C. Circuit has stated which sources of law *cannot* provide causes of action against a foreign nation in suits brought pursuant to § 1605(a)(7), it has never clarified which sources of law *can* provide causes of action. *Price v. Socialist People's Libyan Arab Jamahiriya,* 389 F.3d 192, 200 (D.C.Cir. 2004) (declining to rule on the appropriate cause of action in a suit brought pursuant to 28 U.S.C. § 1605(a)(7)); *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1134 (D.C.Cir.2004). The D.C. Circuit has now made clear that federal common law and generic formulations of common law cannot furnish a cause of action. *Acree v. Republic of Iraq,* 370 F.3d 41, 55 (D.C.Cir.2004).

### C. The Plaintiff's Hostage Taking, Torture, and Arbitrary and Prolonged Detention Claims[3]

#### 1. Legal Standard for Third Party Standing

 Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))

 As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130; *Steel Co.*, 523 U.S. at 104, 118 S.Ct. 1003; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C.Cir.2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898–99 (D.C.Cir. 2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.* On a motion for summary judgment, how-

ever, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing Federal Rule of Civil Procedure 56); *accord Florida Audubon*, 94 F.3d at 666.

 To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C.Cir.1999) (citing *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* The D.C. Circuit has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C.Cir.2001). Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C.Cir.1980).

 The test for standing shifts dramatically when claims are brought by

---

**3.** The plaintiff brings these claims under customary international law and a theory of *jus cogens*. Because the court ultimately concludes that the plaintiff lacks third party standing to bring these claims, it need not consider whether these claims are sufficiently "specific, universal, and obligatory" as required for U.S. court adoption of international law. *In Re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir.1994); *see*

*also Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing *In Re Estate of Marcos Human Rights Litig.*, and holding that the federal courts may adopt the law of nations into domestic law so long as the courts engage "vigilant doorkeeping" to ensure that the absorption of international law into federal common law is only "open to a narrow class of international norms today").

third parties. For a claimant to have standing, the plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This rule "ensures that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). Nevertheless, a third party can have standing if: (1) the plaintiff has "suffered some injury in fact thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute," (2) the plaintiff has a close relationship with the party, and (3) there "exist[s] some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (finding in a criminal context that a defendant has the requisite standing to sue on behalf of a juror dismissed for discriminatory reasons) (internal quotations and citations omitted).

## 2. The Plaintiff Lacks Third Party Standing as to Hostage Taking, Torture, and Arbitrary and Prolonged Detention

The plaintiff's allegations of torture, arbitrary and prolonged detention and hostage taking are third party claims because they arise from acts perpetrated against the plaintiff's father. Pl. Proposed Findings of Fact and Conclusions of Law at 24 (classifying the plaintiff as the "child of the primary victim"). Frank Reed, not Tarek Reed, is the direct party to these alleged torts and it is he, not the plaintiff, who has direct party standing to bring an action on these claims. Therefore, the court will consider whether the plaintiff has third party standing to bring these claims.

The court does not doubt that the plaintiff has indeed suffered some injury in fact, thus satisfying the first prong necessary for third party standing. *Powers*, 499 U.S. at 411, 111 S.Ct. 1364. Likewise, lengthy prose are unnecessary to traduce that the relationship between a son and his father constitutes the requisite close relationship for the second prong of the third party standing test. *Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (finding a father child relationship sufficiently close to satisfy the second prong of *Powers*).

■■■ In addition to an injury in fact and a close relationship between the plaintiff and the direct party to the tort, however, the plaintiff must demonstrate that there is some hindrance to the third party's ability to bring suit. *Powers*, 499 U.S. at 411, 111 S.Ct. 1364. This much the plaintiff has not shown. The plaintiff son makes neither a claim that his father is unable to sue on his own behalf nor a claim that the plaintiff is suing on his father's behalf, *Powers*, 499 U.S. at 411, 111 S.Ct. 1364, but solely proceeds as if the claims are properly brought by him, for him. With no allegation that he is suing on behalf of his father or that his father is incapable of suing on his own behalf, the plaintiff fails to demonstrate standing, as is his burden. *See Singleton v. Wulff*, 428 U.S. 106, 116, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (recognizing the need for the plaintiff to demonstrate "genuine obstacle" to the assertion by the direct party of his own legal rights). With regard to a third party's ability to bring their own suit, the plaintiff's father did, in fact, bring suit asserting his own direct legal rights and interests in *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C.1998). The federal courts' reluctance to allow plaintiffs to bring suit to vindicate the rights of a third party is

particularly fitting where, as here, the direct party has asserted his own legal rights and interests. *See, e.g., Singleton,* 428 U.S. at 116, 96 S.Ct. 2868 (holding generally that "assertion of third parties' rights would come with 'greater cogency' from the third parties themselves") (internal citations omitted). Without a demonstrated hindrance of Frank Reed's ability to bring suit for his own kidnaping, torture, and detention, the plaintiff lacks constitutional standing to assert those claims. Accordingly, the court denies plaintiff's motion for default judgment as to his hostage taking, torture, and arbitrary and prolonged detention claims.

### D. The Plaintiff's Intentional Infliction of Emotional Distress and Solatium Claims

The plaintiff claims that he is entitled to default judgment as to his claims of intentional infliction of emotional distress and solatium arising under Massachusetts common law. Pretermitting an inquiry as to

whether he has succeeded at his burden in this regard, the court must determine whether Massachusetts law controls. . To do so, the court must assess what choice-of-law rules govern this claim—a non-federal cause of action brought under FSIA.

### 1. Choice of Law

■ In a FSIA case such as this, District of Columbia choice-of-law rules apply to issues governed by state law. *Virtual Def., Dev. Int'l., Inc. v. The Republic of Moldova,* 133 F.Supp.2d 9, 15 (D.D.C.2001) (holding that the goal expressed in § 1606 "of applying identical substantive laws to foreign states and private individuals cannot be achieved ... unless a federal court utilizes the same choice-of-law analysis in FSIA cases as it would if all the parties of the action were private").[4]

### 2. Legal Standard For District of Columbia Choice–of–Law Analysis

■ As a threshold inquiry, District of Columbia choice of law analysis requires a

---

4. Other courts have applied federal common law choice-of-law rules for issues governed by state law under FSIA on the grounds that FSIA does not include an explicit choice-of-law provision. *See Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000, 1003 (9th Cir.1987) (stating that "[i]n the absence of specific statutory guidance, we prefer to resort to the federal common law for a choice-of-law rule"). Although FSIA does not include a specific choice-of-law provision, it is not true that it provides no statutory guidance. Section 1606 directs this court, in the context of actions brought under § 1605(a)(7), to "allow plaintiffs to bring any claims they would be able to bring if the defendant were a private individual charged with the same acts of terror." *Dammarell v. Islamic Republic of Iran,* 2005 WL 756090, at * 11 (D.D.C.2005); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (stating that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances").

The absence of a specific choice-of-law provision requires the court to infer the choice-of-law analysis that will best effectuate congressional intent from the statutory language. *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 961 (2nd Cir.1991) (stating that "the fact that we are not compelled to apply state choice-of-law principles in this federal question case does not preclude us from relying on state law if we believe that doing so would best effectuate Congress' overall intent"). Furthermore, the Supreme Court has advised that "cases in which judicial creation of a special federal rule would be justified" are "few and restricted" and "are limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers v. Fed. Deposit Ins. Corp.,* 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (quotation marks omitted). For these reasons, the court prefers to apply the choice-of-law principles of the District of Columbia to issues governed by state substantive law as

determination of whether a "true conflict" exists. *GEICO v. Fetisoff,* 958 F.2d 1137, 1141 (D.C.Cir.1992). The true conflict test asks whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdiction is different. *See id.*

A false conflict exists when either (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its laws and the policies of the states whose laws are claimed to be in conflict would not be advanced by application of their law. *Long v. Sears Roebuck & Co.,* 877 F.Supp. 8, 11 (D.D.C.1995); *accord Biscoe v. Arlington County,* 738 F.2d 1352, 1360 (D.C.Cir.1984).

 If a true conflict exists, the court follows the District of Columbia's choice-of-law principles, which utilize a "constructive blending" of two distinct analyses; the "governmental interests" analysis and the "most significant relationship" test. *Hercules & Co., Ltd. v. Shama Rest. Corp.,* 566 A.2d 31, 41 n. 18 (D.C. 1989); *see also, Stephen A. Goldberg Co. v. Remsen Partners, Ltd.,* 170 F.3d 191, 194 (D.C.Cir.1999); *Virtual Dev.,* 133 F.Supp.2d at 15. "Under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Her-*

*cules & Co.,* 566 A.2d at 40. In determining which jurisdiction has the most significant relationship to the dispute, there are four relevant factors under the Restatement: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971); *Hercules,* 566 A.2d at 42 (adopting the Restatement (Second) of Conflict of Laws § 145). Section 145 also references § 6 of the Restatement for the courts to consider:

[w]hen there is no [state statutory directive on choice-of-law,] the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971); *Dunkwu v. Neville,* 575 A.2d 293, 296 (D.C.1990) (adopting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971)).

---

the best effectuation of congressional intent and as an alternative to the unbounded discretion that judicial creation of an alternative rule would imply. *See generally* Joel Mendal Overton, II, *Will the Real FSIA Choice–Of–Law Rule Please Stand Up?,* 49 WASH. & LEE L.REV. 1591, 1602 (1992) (concluding that "[w]ith the exception of cases

brought under the court's diversity jurisdiction, under which a clear choice-of-law rule exists, and cases brought pursuant to a particular statutorily granted cause of action containing its own choice-of-law provision, courts appear to be free to pick and choose whatever choice-of-law rules justice may require").

### 3. The District of Columbia's Choice-of-Law Analysis Requires Application of Massachusetts Law

There are three possible sources of law: (1) the law of the plaintiff's domicile state, Massachusetts, (2) the law of the forum state, the District of Columbia, and (3) the law of the foreign state where the alleged injuries occurred, Lebanon.[5]

■ While Lebanon clearly has some degree of interest in adjudication of this matter because the hostage-taking occurred within its borders, the complicated factual nature of this case points away from Lebanon contacts and interests. First, though the actual abduction took place in Lebanon, the plaintiff seeks recovery for intentional infliction of emotional distress and solatium, injuries which the plaintiff suffered in the United States. *See generally* Compl. ¶¶ 23(a)-(g). Second, the plaintiff alleges that Iran, not Lebanon, provided material support and the means to carry out such acts in Lebanon. *Id.* Finally, Frank Reed is a United States citizen, and his hostage-taking was allegedly meant to force numerous actions by the United States government. *Id.*

■ By contrast, several factors weigh in favor of the application of domestic law. D.C.'s constructive blending approach requires that the court consider the § 6 factors of the Restatement (Second) of Conflicts of Law in tort actions, the most important of these factors is (c), "the relevant policies of the forum and of other interested states and the relative interests of those states in the determination of the particular issues." *Long*, 877 F.Supp. at 11 (quoting Restatement (Second) of Conflicts of Law § 6(2) (1971)). The state-sponsored terrorism exception embodied in § 1605(a)(7) is "designed to influence the sovereign conduct of foreign states," *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 14 (D.D.C.1998), and meant to "give American citizens an important economic and financial weapon against ... outlaw states," H.R.Rep. No. 104–383, at 62. This expressed interest also extends to families who suffer injuries as a result of terrorist acts committed against a member of that family. *Id.* (stating that "the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted").

In furtherance of these goals, the United States has a unique interest in applying its own law, rather than the unfamiliar law of a foreign nation, to determine liability involved in a state-sponsored terrorist attack on one of its citizens, particularly when such an attack is directed against its national interests. *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 * 20 (D.D.C. March 29, 2005) (noting that "the United States has an interest in projecting its laws overseas for 'certain conduct outside its territory by persons not its nation-

---

5. Although the law of Iran, the foreign state where material support of the Hizbollah allegedly occurred, is also a conceivable source of law in this case, the court rejects this choice. It is implausible to conclude that Congress would have passed § 1605(a)(7) to grant jurisdiction to federal courts over foreign states that the United States Department of State has determined to be state sponsors of terrorism, only to require application of the law of such states (to the extent such states can be said to have law). *See* H.R.Rep. No. 104–383, at 62 (1995) (stating that "[t]hese outlaw states consider terrorism a legitimate instrument of achieving their foreign policy goals. They have become better at hiding their material support for their surrogates, which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like").

als that is directed against the security of the state or against a limited class of other state interests' ") (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(3) (1987)). These unique interests are not always involved in § 1605 cases, and cannot always justify application of United States law over the law of a foreign jurisdiction. *See, e.g., Harris*, 820 F.2d at 1003–4 (utilizing federal common law choice-of-law principles to apply Polish law in a case brought under § 1605(a)(2)); *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 756 F.Supp. 136, 141–42 (S.D.N.Y.1991) (utilizing New York's choice-of-law rules to apply Bolivian law in a case brought under § 1605(a)(2)). Under the facts of this case, however, the foregoing factors weigh in favor of applying the law of a forum within the United States.[6]

Accordingly, the law of the United States forum, rather than the law of Lebanon or Iran, will apply to the plaintiff's claims. Massachusetts and the District of Columbia are each part of a larger jurisdiction—the United States—and share its interests in an internationally-oriented choice-of-law analysis such as this. *See Alvarez–Machain v. United States*, 331 F.3d 604, 635 (9th Cir.2003) (conducting a choice-of-law analysis under the FSIA by first balancing the relevant contacts and interests as between the United States and Mexico, and after finding the United States' interests more weighty, conducting a choice-of-law analysis as between the federal common law and the law of California).

The plaintiff asserts that the law of Massachusetts should control. The United States jurisdiction with the most significant interests in this action is the plain-

tiff's state of domicile. Accordingly, the court rules that the United States jurisdiction with the most significant interest in this action is Massachusetts, and Massachusetts law will govern plaintiff's claim of intentional infliction of emotional distress and solatium.

**4. The Plaintiff Fails to Establish a Prima Facie Case of Intentional Infliction of Emotional Distress Under Massachusetts Law**

**a. Legal Standard for Intentional Infliction of Emotional Distress Under Massachusetts Law**

■ To establish a claim of intentional infliction of emotional distress under Massachusetts law, the plaintiff must demonstrate: (1) "that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct," (2) that the conduct was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community," (3) "that the actions of the defendant were the cause of the plaintiff's distress," and (4) that the emotional distress suffered by the plaintiff was "severe" and of a nature "that no reasonable person could be expected to endure it." *Quinn v. Walsh*, 49 Mass.App.Ct. 696, 732 N.E.2d 330, 338 (2000) (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 681 N.E.2d 1189, 1197 (1997)); *See Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318–319 (1976).

■ For a claim of intentional infliction of emotional distress brought by a victim's family member, the plaintiff must demonstrate two additional elements: (1) that the family member had substantial, contemporaneous knowledge of the defen-

---

**6.** The D.C. Circuit recognized that because federal common law lacks adequate development, courts should apply the Restatements and state decisional law. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C.Cir. 2003).

dant's act; and (2) that the distress was a direct result of this knowledge. *Nancy P. v. D'Amato*, 401 Mass. 516, 517 N.E.2d 824, 828 (1988); *See also, Krasnecky v. Meffen*, 56 Mass.App.Ct. 418, 777 N.E.2d 1286, 1289 (2002) (acknowledging the "pragmatic judgements" in intentional infliction of emotional distress cases requiring "spacial and temporal proximity" between the plaintiff and the "tortious act").

### b. The Court Denies the Plaintiff's Motion for Default Judgment as to his Intentional Infliction of Emotional Distress Claim

■ The court has no doubt that the plaintiff has satisfied the first four traditional prongs for intentional infliction of emotional distress. The plaintiff's father was intentionally kidnaped by the Hizbollah, constituting extreme and outrageous behavior, and the plaintiff ultimately suffered greatly as a direct result of the post-kidnaping effects on the plaintiff's father.

The element requiring substantial, contemporaneous knowledge of the defendant's act, however, bars the plaintiff from obtaining a default judgment as to this claim. As the plaintiff himself acknowledges, he remained unaware of his father's captivity and torture throughout its duration. Fifi Reed Test. at 131. When the kidnaping occurred, the plaintiff's mother told him that his father was working to earn a living for the family. *Id.* Later, when his classmates talked about his father, his mother told him that his father was "in a house" but did not tell him of his father's torture. *Id.* The plaintiff's distress coincided with his father's behavior after his release and upon returning to the United States, rather than from the plaintiff having contemporaneous knowledge of his father's tribulations. Price Rep. at 6. Because the plaintiff did not have contemporaneous knowledge of his father's torture, his claim of intentional infliction of emotional distress fails to satisfy the requisite elements for such a claim by a victim's family member under Massachusetts law. *Nancy P.*, 517 N.E.2d at 828. For this reason, the court denies the plaintiff's motion for default judgment as to the plaintiff's claim of intentional infliction of emotional distress.[7]

### 5. Solatium is not an Independent Legal Cause of Action

■ Solatium is available to a FSIA plaintiff when extreme and outrageous conduct has caused grief and anguish to those plaintiffs closely related to a victim of terrorism. E.g., *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 29 (D.D.C. 1998); *Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 269–70 (D.D.C.2002). Solatium, however, is not an independent cause of action, but rather is a form of

---

7. The plaintiff brings his intentional infliction of emotional distress claim under both Massachusetts law and customary international law. As the plaintiff correctly notes, were the court to apply intentional infliction of emotional distress within the rubric of customary international law, it would apply the Restatement Second of Torts, which is the same legal standard adopted in Massachusetts. *See Nancy P. v. D'Amato*, 401 Mass. 516, 517 N.E.2d 824, 827–828 (1988) (applying Restatement (Second) of Torts to intentional infliction of emotional distress claim); *see Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996) (holding that the court may "fashion domestic common law remedies to give effect to violations of customary international law"). Like the law in Massachusetts, the Restatement has a contemporaneous presence requirement. RESTATEMENT (SECOND) OF TORTS § 46(2) (1965) (stating that an intentional infliction of emotional distress claim may be brought by a family member "who is present at the time"). Because the plaintiff was not present for his father's torture, he cannot bring a claim of intentional infliction of emotional distress. Therefore, whether the court analyzed plaintiff's claim under Massachusetts law or customary international law is of no moment, and would net the same result.

damages. *Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d 105, 115 (D.D.C.2005). A defendant cannot be liable for solatium but can be liable for solatium damages through other causes of action. *Id.* (holding that although "a claim for solatium refers to the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience ... [a] plaintiff cannot state a claim for solatium directly, but she may obtain the equivalent of solatium damages through her other causes of action") (quoting *Dammarell v. Islamic Republic of Iran,* 281 F.Supp.2d 105, 195 (D.D.C.2003)).

For this reason, plaintiff's solatium claim does not constitute an independent cause of action, and the court denies the plaintiff's motion for default judgment as to this claim.

## IV. CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion for default judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 17th day of July, 2006.